UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
HEATHER DINGMAN,

                    Plaintiff,                              Case No.: 20-CV-4850-NSR

-against-

FUJI JAPANESE STEAKHOUSE
SUSHI INC. and AN H CHEN, aka ANDY CHEN,
in his official and individual capacities,

                    Defendants.
-------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Law Office of Laura Wong-Pan PLLC
319 Mill Street
Poughkeepsie, NY 12601
(845) 218-1288

i

## Table of Contents

**PRELIMINARY STATEMENT** ................................................................................. 1

**STATEMENT OF FACTS** ...................................................................................... 2

**LEGAL STANDARDS** ........................................................................................ 11

   A.   Summary Judgment Standard ...................................................................... 11

   B.   Standards for Establishing violation of Title VII .......................................... 12

**ARGUMENT** ................................................................................................... 14

   **A.   Because the Record Contains Direct Evidence That Defendant's Adverse Promotional Decision Was "Because of Sex," Defendant's Motion for Summary Judgment Must Be Denied.** 14

   **B.   Analyzed Using the McDonnell Douglas Framework, Disputes of Material Fact Bar Defendant's Motion for Summary Judgment.** ................................................. 15

      1.   Plaintiff's Establishes a Prima Facie Case of Sex Discrimination ............................. 16

      2.   Defendant Has Failed to Offer Any Legitimate Non-Discriminatory Justifications for Its Decision. ................................................................................................. 17

      3.   The Record Demonstrates the Existence of a Factual Dispute Over Whether Employer's Justifications Are Pretexts for Discrimination Because of Sex .......................................... 19

   **C.   Plaintiff has satisfied all preconditions to suit with respect to the retaliation cause of action, and there are triable issues of fact.** ............................................ 20

      1.   Retaliation Claim is Reasonably Related to NYSDHR Complaint ............................ 20

      2.   There are triable issues of fact with respect to the retaliation cause of action. .......................... 21

   **D.   Defendants have not established an entitlement to summary judgment with respect to the NYSHRL claims** ....................................................................................... 22

    **E.   There is no basis to dismiss the claims against Chen under Sections 296(1) and (6).** ......... 23

    **F.   Chen's Affidavit Contradicts his Deposition Testimony and should be Disregarded.** ....... 23

   **CONCLUSION** ................................................................................................ 25

# Table of Authorities

*Bundy v. Broome-Tioga Bd. of Coop. Educ. Servs*. 19-CV-1112 (N.D. N.Y. June 19, 2020) ..... 20

*Chadwick v. Wellpoint, Inc*., 561 F.3d 38 (1st Cir., 2009) .......................................................... 11

E.E.*O.C. v. Suffolk Laundry Servs., Inc*., 48 F. Supp. 3d 407 (E.D.N.Y. 2014)........................... 22

*Gallo v. Prudential Residential Serves., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994)...................... 12

*Gorman v. Covidien, LLC,* 146 F. Supp. 3d 509 (S.D.N.Y. 2015)................................................. 22

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614 (2d  Cir. 1996) ................................................... 23

*James v. New York Racing Assn*, 233 F.3d 149 (2d Cir. 2000) .................................................... 12

*Johnson v. Killian*, 680 F.3d 234 (2d Cir. 2012) ......................................................................... 11

*Mack v. United States,* 814 F.2d 120 (2d Cir. 1987). .................................................................. 23

*McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973) ............................................................ 12

*Overton v. N.Y. State Div. of Mil. & Naval Affs*., 373 F.3d 83 (2d Cir. 2004) ............................. 11

*Parra v. White Plains,* 48 F.Supp.3d 542 (S.D.N.Y. 2014)........................................................... 22

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)..................................................................... 11

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). ........................................................... 18

*Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133 (2000)....................................................... 18

*Ruiz v. County of Rockland*, 609 F.3d 486 (2d Cir. 2010)…………………………………………...

*Rose v. New York City Bd. of Educ.,* 257 F.3d 156 (2d Cir. 2001)................................................ 13

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77 (2d Cir. 2004) ......... 11

*Shah v. N.Y. State Dep't of Civil Servs*., 168 F.3d 610 (2d Cir. 1999).......................................... 19

*Sista v. CDC Ixis N. Am., In*c., 445 F.3d 161 (2d Cir. 2006)........................................................ 13

*Slattery v. Swiss Reinsurance Arbitration America Corp*., 248 F.3d 87 (2d Cir. 2001)............... 12

*Smith v. North Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501 (E.D.N.Y. 2018). .. 13

*Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003) .......................................................................... 13

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) .......................................... 16

*Weyant v. Okst,* 101 F.3d 845 (2d Cir. 1996)……………………………………………..

*Zambrano-Lamhaouhi v. NYC Bd of Education*, 806 F.Supp.2d 147  (E.D.N.Y. 2011)………12

## PRELIMINARY STATEMENT

After eight years of serving Fuji Japanese Steakhouse Sushi Inc. ("Fuji") as a full-time server, a Shift Lead and regularly acting as General Manager, Plaintiff Heather Dingman was the most qualified individual for the General Manager position when Jill Mattiello resigned two weeks after Dingman returned from maternity leave.

When owner An H ("Andy") Chen learned that the position was available on August 12, 2019, knew that Dingman was waiting to talk to him about the position, he hurriedly offered it to an employee without children, pressed her to decide immediately, and told at least three people that Ms. Dingman's brain is "scrambled" or "fried" by her baby, and one employee, Jill Mattiello, reported to Dingman that Chen thought she did not work enough and another employee, Suzan Narvaez, reported that Chen said she did not have time any more, as an explanation for why she was not promoted. Ms. Dingman was upset and resigned, realizing that her opportunity for advancement was hindered for discriminatory reasons.[1]

There is ample evidence in the record from which a reasonable factfinder could conclude that Chen's decision not to promote Plaintiff was "because of sex" based on the stereotype that young mothers make undesirable employees.  See *Chadwick v. Wellpoint*, 561 F.3d 38 (1st Cir. 2009); *Zambrano-Lamhaouhi v. NYC Bd of Educ.*, 806 F.Supp. 2d 147 (E.D.N.Y. 2011).  Chen's language at the time of the decision, his selection of a woman without an infant, and the surrounding circumstances would all point a reasonable factfinder to the conclusion that Chen's decision was motivated by impermissible gender-based stereotypes, which constitutes

---

[1] Plaintiff is still entitled to backpay. See, e.g. *Benzinger v. Lukoil Pan Ams., LLC* , 16 Civ. 8533 (PAE) (S.D. N.Y. Feb. 8, 2021) and *Nobler v. Beth Israel Medical Center,* 715 F.Supp. 570 (S.D.N.Y.1989), in which the court allowed the plaintiff to recover post-resignation backpay because "the position which [the plaintiff] was allegedly discriminatorily denied ... was unique" and "there was no purpose to be served by [the plaintiff's] staying ... to try to work out the dispute within the context of the employment relationship, for amelioration was unavailable." *Id.* at 572.

1

discrimination because of sex in violation of Title VII, as well as plaintiff's familial status as a new mother, in violation of the New York Human Rights Law. There are also many disputes of material facts and credibility issues, as reflected in Defendants own Rule 56.1 Statement, that make summary judgment untenable.  Summary judgment should be denied.

## STATEMENT OF FACTS

The relevant facts are fully set forth in Plaintiff's Counter-Statement Pursuant to Local Civil Rule 56.1 ("Counter 56.1"), Defendants' Rule 56.1 Statement ("Def. 56.1") and Plaintiff's responses to Defendants' Rule 56.1 statement ("56.1 Response").

Dingman was hired to work at Fuji in Middletown, New York as a server in May of 2011 when the restaurant first opened. (56.1 Response ¶1).  In 2012, Jill Mattiello was hired as a part-time bartender and was elevated to General Manager by owner Jia (Jay) Yang in 2015 or 2016. (56.1 Response ¶3,6).  Mattiello was not a new mother when she was promoted to General Manager; her children were born in 2005 and 2007. (56.1 Response ¶6). As General Manager, Mattiello handled all staff scheduling, maintained a smooth-running shift and resolved customer service issues.  (Counter 56.1 ¶7).  Andy Chen joined Fuji after Mattiello became a General Manager.  (56.1 Response ¶5). Yang testified that he offered Dingman the General Manager position multiple times before Mattiello was given the position. (56.1 Response ¶104-107).

Mattiello created a Shift Lead system in around 2015, when she became general manager. (Counter 56.1¶6).  The Shift leads are assigned for a particular shift, and they work to reduce customer's waiting time, ensure that busboys were cleaning tables, and to move people in and out of the restaurant. (Counter 56.1 ¶8; Dingman Aff. Exh. 1). Most often, Mattiello was the Shift Lead when she was working. (Counter 56.1 ¶8). Dingman was the first server promoted to Shift Lead in 2015 and was promoted by Yang or Chen. (Counter 56.1 ¶6).

2

Dingman was a good employee, and was usually early, rarely late. (Counter 56.1 ¶10). If she was late, she would let Mattiello know in advance, in accordance with the restaurant's practice. (Counter 56.1 ¶10). Dingman was professional, and they depended on her if Mattiello was out sick or went on vacation. (Mattiello 22:21-25). Dingman frequently worked as Shift Lead. From January 2018 through May 2019 she was designated as Shift Lead on approximately 100 different shifts. (Counter 56.1 ¶14).

Amanda Daston, the individual who was promoted to General Manager on August 12, 2019, was assigned as Shift Lead approximately one-third as frequently as Plaintiff during the same time period, and rarely when Dingman was on the same shift. (Counter 56.1 ¶14).

Chen gave no indication that he was displeased with Ms. Dingman's performance. (Counter 56.1 ¶13). Chen trusted Dingman to handle payroll when Chen went on vacation, which is something that Jill Mattiello was never involved in. (Counter 56.1 ¶13).

Mattiello was on maternity leave for six weeks in about August and September 2018. (Counter 56.1 ¶12). It was Chen's choice for Dingman to fill in for Mattiello while she was gone. (Counter 56.1 ¶12). Dingman took on Mattiello's entire role, including scheduling, when Mattiello was on her maternity leave. (Counter 56.1 ¶12).

Upon Mattiello's return from maternity leave, she initially worked two or three days a week for a while. (Counter 56.1 ¶18). Bar Manager/Shift Lead Jacob Sienkiewicz observed, based on Chen's demeanor and body language, that he was frustrated by Jill's absence, including when he needed to take time off. (Counter 56.1 ¶18).

About a month after Mattiello returned from maternity leave, in October 2018, the Bar Manager position became vacant. (Counter 56.1 ¶ 15). Mattiello told Chen she could handle both positions, Bar Manager and General Manager. (Counter 56.1 ¶15). Chen did not want that to

happen, and he decided that Heather Dingman would be General Manager (Counter 56.1 ¶15), effectively demoting Mattiello to Bar Manager. (Counter 56.1 ¶15). On October 22, 2018, Chen wrote a text message to Dingman and Mattiello:

> Thank you for your continued support. Once again it is this company needs: I don't do whatever I want too; since bar manager Dan left. Company needs this bar manager which Jill wants to take over. Then Heather is taking over Jill's work. I will be announcing to Fuji team soon. We're getting busby (sic) again this year. We need to get ready while align with company engineering process for years ever since. Thanks! Andy Chen.

> (Counter Rule 56.1 ¶16; Wong-Pan Decl. Exh. 8).

Assigning Dingman to take over the General Manager position on October 22, 2018, was completely Chen's decision, overruling Mattiello's recommendation that she take over both roles. (Counter 56.1 ¶17). The plan ultimately did not materialize since Sienkiewicz was hired as bar manager, (Chen Affidavit ¶34), but Chen's trust in Dingman was evident through that offer.

Dingman was adept at making sure the scheduling was done properly and that Chen's needs were filled "as far as whatever paperwork and administrative needs needed to be done." (Counter 56.1 ¶22). Scheduling entails setting up the scheduling and the shifts, and what sections of the restaurant each employee is going to work in. That would entail on a weekend night with full staff, up to eight people working the hibachi sections, three in dining, someone handling sushi bar and potentially two bartenders. (Counter 56.1 ¶22).

Dingman is extremely organized as far as scheduling goes, and the staff like her, and she knew how to talk to people and deal with customer complaints. (Counter 56.1 ¶21). Dingman was the longest serving employee and had taken on a lot of Jill's responsibilities. (Counter 56.1 ¶20). Handling scheduling is one factor separating Heather from the other shift leads, which is challenging due to scheduling conflicts and requests for time off. (Counter 56.1 ¶23). Daston did

not handle scheduling when she was Shift Lead. (Counter 56.1 ¶24).

Dingman was on maternity leave from about May 20, 2019 to about July 30, 2019.  (Def. 56.1 ¶38; Counter 56.1 ¶29). Dingman's daughter was born on June 1, 2019 but she left early because her doctor thought she could go into labor any moment. (Counter 56.1 ¶28).

Chen's trust in Plaintiff was evident in his text messages while she was maternity leave, including June 18, 2019 and July 6, 2019 when he asked her to return before July 15, 2019, when his vacation started, so he could show her how to handle payroll. (Counter 56.1 ¶29-30; 56.1 Response ¶37). Dingman's daughter was only 6 weeks old, and she told him she could not come in until the end of July. (Counter 56.1 ¶28).

Dingman worked a reduced schedule of 35.25 hours for the one payroll period after she returned, from July 29, 2019 to August 12, 2019, but this was intended to be temporary. (Counter 56.1 ¶30). For the same period of time (July 29, 2019 to August 12, 2019), Daston worked virtually the same number of hours (35.24) hours as Dingman. (Counter 56.1 ¶31). Dingman felt ready to work full-time as of August 12, 2019. (Counter 56.1 ¶32).

A few days before informing Andy Chen she was resigning, Mattiello informed Yang and he was upset she was leaving. (Counter 56.1 ¶33). Mattiello recommended Dingman as her replacement. (Counter 56.1 ¶33).

On August 12, 2019, Mattiello officially resigned. (56.1 Response ¶63-64; Counter 56.1 ¶34). Mattiello wanted the restaurant to remain stable, and she recommended that Heather serve as General Manager and that Suzan Narvaez serve as a second or co-manager position. (Counter 56.1 ¶35). When Mattiello approached Chen to say she was resigning, Dingman was present and Dingman told Chen: "I'm willing to take on the position. I'm ready to step into it."  (Counter 56.1 ¶36). Chen said he needed five minutes. (Counter 56.1 ¶36). Dingman went into the mall to

wait. (Counter 56.1 ¶37).

While Dingman was in the mall, Mattiello spoke to Chen at more length and told him she was resigning, and that Heather was coming in to talk to him about the opportunity with the position. (Counter 56.1 ¶37). Chen immediately contacted Amanda Daston and demanded an answer as to whether she would take the position. (Def. 56.1 ¶76). Shortly thereafter, Chen posted on the ScheduleFly system for all employees to be notified that Daston was the new General Manager. (Def. 56.1 ¶79).

After Mattiello received the ScheduleFly message stating that Daston was chosen, she confronted Chen to ask why he had not chosen Dingman, and Chen said, "her brain is scrambled from having a baby." (56.1 Response ¶69; Counter 56.1 ¶39). Mattiello was in shock on hearing that and did not respond with anything but "wow." (Counter 56.1 ¶39). Dingman returned to the restaurant and also confronted Chen, telling him: "I was there when Jill was on maternity leave, I thought I was a trusted employee, and you didn't even give me the courtesy of a discussion and you went behind my back." (Counter 56.1 ¶40). Sienkiewicz heard Dingman use words such as "unfair" and "ridiculous." (Def. 56.1 ¶72). Chen told Dingman that she was acting crazy, and it was because of her baby. (Counter 56.1 ¶42).

Suzan Narvaez, a co-worker, texted Mattiello to say that Chen "kept saying baby make your brain fried. I was like what is wrong with you." (sic) (56.1 Response ¶74). Narvaez corroborated to Mattiello that she heard Chen make the statement about Heather's baby affecting her brain. (Counter 56.1 ¶42). Mattiello testified that she understood Andy's words to mean that Dingman was not eligible for this position due to having a baby. (Counter 56.2 ¶46).

Mattiello also texted Dingman on August 12, 2019, to state that "he's worried about how little you work." (Counter 56.1 ¶42). On August 14, 2019, Narvaez texted Dingman that "he

said you have baby you have no time no more." (Counter 56.1 ¶43).

Mattiello testified that when Chen said that "Heather's brain was scrambled from having a baby, it not only offended her, but also offended me and probably every other mother in the restaurant." (56.1 Response ¶78). On August 13, 2019, Mattiello wrote to Yang:

> If Andy is going to remain in his position you need to make sure he understands the law. Specifically, discrimination. I care so much about Fuji and it is killing me to watch him treat it like this. He says some really awful things that are one day going to get him into a lot of trouble. I know I already told you about this when I called you but yesterday it was excessively bad. Heather quit because of it." (Counter 56.1 ¶44).

Yang responded: "I feel helpless." (Counter 56.1 ¶45). Mattiello also told Yang: "What he did yesterday made it almost impossible for me to make my departure smooth. I obviously will still try my best. I always will." (Counter 56.1 ¶45).

Also on August 13, 2019, Yang texted to Mattiello: "Things always happen when my hands are tied." (Counter 56.1 ¶48). He testified that his "hands are tied," because he could not fire Andy Chen. (Counter 56.1 ¶48). Yang wanted to fire Andy at that point, in August 2019, and at other points as well. (Counter 56.1¶48).

On August 14, 2019, Chen wrote to Dingman to ask why she would not give two weeks' notice, and she wrote: "since you need clarification, my final day will be the 23rd. Is that enough notice for someone who wasn't offered the position because my brain is "scrambled by a baby?" (Counter 56.1 ¶49). A few minutes later Chen responded: "Thanks for your classification. Greatly appreciated. Good luck to you. God Bless you and your family." (Counter 56.1 ¶49). About twelve minutes later, he texted: "Heather, You please think twice what is going for the past days: you will realize something. Best regards, Respect and recognition goes to you. Andy." He then added: "If you carefully think twice your will realize that you'd brain is

"scrambled by a baby"? (Counter 56.1 ¶49-50).

Dingman responded: "So are you saying my brain is in fact scrambled by my baby?" (Counter 56.1 ¶51). Chen wrote: "If you could calm down a bit; have a chance to talk to me; then everything should have worked out very well, but you did not give a chance to talk.  Thank you Heather!  Again, respects and recognition goes to you!  Best, Andy"  (Counter 56.1 ¶52).

At his deposition, Chen claimed that he did not promote Plaintiff because her customer service skills were not "up to par." (Response 56.1 ¶13, 33, 54, 56, 97, 108). Bar Manager/Shift Lead Jacob Sienkiewicz testified he is not aware of any situation where Heather was less than professional and friendly towards a customer.  (Counter 56.1 ¶53). Plaintiff was never written up for rudeness to customers or for any other reason. (Counter 56.1 ¶53). There were no customer complaints about Ms. Dingman as a server or as a shift lead.  (Counter 56.1 ¶53). Mattiello kept track of social media reviews of the restaurant and there were none criticizing Heather Dingman. (Counter 56.1 ¶54). Dingman is not aware of any negative reviews about her service at Fuji Restaurant, and none have ever been brought to her attention.  (Counter 56.1 ¶54). Dingman was not written up by Jill Mattiello or anyone else for any infractions.  (Counter 56.1 ¶53).

When asked, "Do you remember any specific instance of rudeness to a customer?"  Chen was unable to provide any specific response. (Chen 103:15-19 (Wong-Pan Decl. Exh. 3).  He testified vaguely "well, I don't recall the particular incident..." and alleged that she "chased" Donna away.  Id.  He said, "I don't recall the direct incident but I know she no good to customers."  (Chen 104:8-12).  Chen was asked again: "Can you remember any particular date, or approximate date, when she was rude to customers?"  He responded vaguely: "I don't record that. It happened often. Everybody knows. I just don't record that." (Chen 104:13-24).  Later, he was asked again, "what incident do you base your opinion that her customer service skills were

not up to par?" (Chen 164:21-24).  He again vaguely answered: "I know her customer service is not up to par" and "she not good to customer" and then offered that if there is a complaint that a chicken is dry, "she would just say no."  (Chen 164:24-165:19).

Chen also claims she gets angry, but when pressured for one time when she got angry, he again became evasive, saying "I didn't record it, but you insist the question, I have to make up something. I don't want to do that." (Chen 167:21-168:7).

Chen claimed in his affidavit that he did not promote Plaintiff because she did not work enough hours.  (Chen Aff. Exh. 8), however, from January 1, 2018 until her maternity leave. Dingman regularly worked a full-time schedule of 55-70 hours biweekly and worked much more frequently than Daston as Shift Lead.  (Counter 56.1 ¶25, 26).

Unlike Dingman, Daston had inter-personal conflicts with some of the staff. (Counter 561. ¶60). Mattiello received complaints regarding Daston about how she spoke to employees. (Counter 56.1 ¶60).  As General Manager, Mattiello had to speak to Daston about the tone that she used to speak to employees. (Counter 56.1 ¶60).

Both Yang and Chen were evasive at their deposition on many issues. For example, Yang testified vaguely about his frustration with Chen, stating: "Fuji have a lot of problems is general" and problems "dealing with Andy also."  (Yang 77:2-25).  But when asked for details, Yang answered: "I didn't say dealing with Andy was a problem. In the text, I didn't say it was a problem. I said dealing with Andy also." (Yang 78:6-10). He testified "Andy and everything going on in the restaurant is a problem" and "I'm having problems dealing with Andy every day." (Yang 78:23-79:7). When asked again what kind of problems he had dealing with Chen, he answered: "General problems.  I can't explain to you." (Yang 79:8-11).  Yang repeated "Andy's a problem." (Yang 79:19).  He added that Chen's "management style" is a problem, and when

9

asked "what about his management style would be a problem from your eyes?" Yang responded: "Like a say, it's a very wide problem. I mean I could go all day long just one single question." (Yang 79:22-80:17). On November 30, 2019, Yang admitted to Mattiello that he needed to "fix Andy." (Wong-Pan Decl. Exh. 6).

<u>Fuji's Anti-Discrimination Policies and Practices</u>

Dingman was first given an Employee Handbook on or about June 7, 2015, four years after she started work at Fuji. (56.1 Response ¶9). The Handbook contains general statements about not tolerating discrimination but does not contain any procedures describing how to submit discrimination complaints. (56.1 Response ¶9). Mattiello is not aware of any internal complaint procedure for discrimination complaints. (56.1 Response ¶9). Employees were not given any sexual harassment or anti-discrimination training. (Mattiello 52:12-15: Chen 115:14-14). Sexual harassment training is required by New York State Law. See NY Labor Law 201-G.

<u>Plaintiff's Opposition to Discrimination in the Workplace</u>

Plaintiff complained that Chen did not do anything to stop a frequent customer's racist behavior in a May 13, 2019 text message conversation. (Counter 56.1 ¶61). Customer Donna used foul language and degraded non-Caucasian servers, including for example, telling one employee, Fabiola, to "go back to Mexico." (Counter 56.1 ¶56-57). She had made comments about not wanting to give them a tip because of their ethnicity. (Counter 56.1 ¶57). She used the "N" word toward an African American customer and an employee. (Counter 56.1 ¶62-63).

Staff could not do anything about Donna, because Andy said they could not do anything about it. (Counter 56.1 ¶58). Most servers did not want to put themselves in a situation to be degraded by this customer and refused to serve her. (Counter 56.1 ¶59). Chen did not let Donna know that her actions weren't allowed. (Counter 56.1 ¶65). The only actions Chen took were to

serve Donna himself or have her sit from other customers. (Counter 56.1 ¶59).

Customer Andre, who was Black, was also a regular customer. (Counter 56.1 ¶60). Chen claimed he did not know the regular customer's race or age (Chen 121:14-20). then at further questioning described him as male aged 30-40 (Chen 123:5-7). Chen banned him from Fuji after an accusation that he cursed at a manager. (Counter 56.1 ¶60). In the May 13, 2019 text message conversation, Chen banned Andre from Fuji, and Heather wrote that "Donna, the woman with Tourette's or some kind of illness, is often racist and outwardly horrible to your staff and you do nothing."  (Counter 56.1 ¶61).

<u>Division of Human Rights Complaint</u>

Plaintiff filed a complaint with New York State Division of Human Rights (NYSDHR), which concluded that there was "probable cause" of discrimination based on sex and familial status and that a public hearing was warranted.  (Counter 56.1 ¶72).  After Plaintiff requested an administrative dismissal to proceed in Federal Court, Defendants moved to reopen that determination, and submitted a letter to NYSDHR suggesting Plaintiff was actually not promoted because of her statements in the May 13, 2019 text message exchange. (Counter 56.1 ¶74).  This was the first time Plaintiff was made aware that the conversation was a factor in Chen's decision not to promote her. Plaintiff argued to NYSDHR that, if this is new defense is true, it constitutes retaliation for opposing discriminatory practices. (Pl. 56. 1 ¶75).  The motion was denied, and the matter was administratively dismissed. (Counter 56.1 ¶75).

**LEGAL STANDARDS**

A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); see also *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs*., 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). A court may not weigh evidence or make credibility determinations and must "draw all reasonable inferences" in favor of the non-moving party. *Weyant v. Oks*t, 101 F.3d 845, 854 (2d Cir. 1996).

    B.    <u>Standards for Establishing violation of Title VII</u>

 Title VII prohibits discrimination "on the basis of sex." 42 USC §2000e. It is well-established that it is a violation of Title VII's proscription on sex discrimination to discriminate against a woman based on sexual stereotypes. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989). As stated in *Price Waterhouse*, the failure to promote a female employee based on gender-based stereotypes violates both Title VII and the New York State Human Rights Law. Id. at 251.

    Following *Price Waterhouse*, the First Circuit Court of Appeals held that a failure to promote or hire a woman because of stereotypes that mothers are distracted by their children, or that they lack time for work because they have children or babies, is a form of sex-based stereotyping. *See Chadwick v. Wellpoint, Inc*., 561 F.3d 38 (1st Cir., 2009). The Court stated:

> In the simplest terms, these cases stand for the proposition that unlawful sex discrimination occurs when an employer takes an adverse job action on the assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities. . . . an employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities.

561 F.3d at 45 (cited by *Zembrano-Lamhaouhi v. NYC Board of Education*, 806 F.Supp.2d 147, 171 (E.D.N.Y. 2011)("courts, in rejecting summary judgment in similar cases, have taken judicial notice of the stereotype that pregnant women and young mothers will make undesirable employees").

In the absence of direct evidence of discrimination, claims under Title VII are analyzed under the framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the initial burden of establishing a *prima facie* case discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for the duties required by the position; (3) she suffered an adverse employment action; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. See *McDonnell Douglas,* 411 U.S at 802; *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).

A plaintiff's burden to establish a *prima facie* case is minimal.. See *Gallo v. Prudential Residential Serves., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994); *Slattery v. Swiss Reinsurance Arbitration America Corp*., 248 F.3d 87, 94 (2d Cir. 2001). If the plaintiff proves a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the failure to promote the employee. See *McDonnell Douglas Corp.,* 411 U.S. at 802.

If defendants were able to articulate a nondiscriminatory justification, they would be entitled to summary judgment unless plaintiff can prove that defendants' reasons were merely a pretext for discrimination. At that stage, "to defeat summary judgment[,] . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (ellipsis in original) (quotation marks omitted); *McDonnell Douglas Corp*., 411 U.S. at 804.

**ARGUMENT**

**A. The Record Contains Direct Evidence That Defendant's Adverse Promotional Decision Was Because of Sex.**

A Plaintiff can survive summary judgment by providing direct evidence of discriminatory motive in carrying out an employment decision. Direct evidence of discrimination includes "evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude." *Sista v. CDC Ixis N. Am., In*c., 445 F.3d 161, 173-74 (2d Cir. 2006) (internal quotation marks omitted); *Rose v. New York City Bd. of Educ.,* 257 F.3d 156, 162 (2d Cir. 2001)(discriminatory acts or statements of those who influence the decisionmaker are also direct evidence); *Smith v. North Shore-Long Island Jewish Health Sys*., 286 F. Supp. 3d 501, 514 (E.D.N.Y. 2018).

The record contains direct evidence of discriminatory intent, including verbal and written statements by Andy Chen directly to Jill Mattiello, Suzan Narvaez, and Heather Dingman, at the time of his promotional decision, that he believed that having a newborn baby had "scrambled" or "fried" Dingman's brain and that she would not have enough time to be General Manager. The key factual dispute in this case is whether Chen's refusal to promote Plaintiff was based on improper sexual stereotyping regarding her status as a new mother. His contemporaneous statements showed that he assumed that Dingman's status as a new mother, and her childcare responsibilities, would interfere with her ability to perform her job duties, and that she could not think reasonably due to having a baby. This is direct evidence of discriminatory intent.

Payroll records show that Dingman worked 35.25 hours for the two-weeks when she returned from maternity leave, which is the same number of hours worked by Amanda Daston for the same period of time. Therefore, the only basis for his criticism about Ms. Dingman's hours would be if Chen were counting her maternity leave against her.

14

This direct evidence of discrimination creates a genuine dispute of material fact about whether Defendant's decision not to promote Plaintiff was because of Plaintiff's sex, including sexual stereotyping.  In the face of this evidence, Defendant's motion for summary judgment must be denied.

**B.  Analyzed Using the McDonnell Douglas Framework, Disputes of Material Fact Bar Defendant's Motion for Summary Judgment.**

As stated above, there is direct evidence of discrimination based on Defendant's refusal to promote Plaintiff based on gender stereotyping, which constitutes actionable discrimination because of sex in violation of Title VII, thus the Court need not engage in the *McDonnell Douglas* burden-shifting exercise required in most Title VII cases.

However, even when analyzed under the *McDonnell Douglas* framework, Plaintiff's claims survive summary judgment.  The admissible evidence shows that (1) Plaintiff is a member of a class of people protected by Title VII, (2) that she suffered from an adverse employment action; (3) that she was qualified for the managerial position; (4) that Chen offered the position to someone who is not a new mother and who is not the subject of gender-based stereotypes; and (5) the decision-maker (Chen) made statements strongly suggesting that the decision was based on sexual stereotypes.

The purported explanations that Defendants offer have all the signs of being pretextual: defendants contradict one another, contradict themselves, and their explanations are not borne out by the evidence. They argue that the Court should disregard Mattiello's testimony, although credibility issues are not in the province of the Court at the summary judgment stage.

There are multiple disputes of material facts in this case, including disputes as to how much Dingman was trusted, how well she got along with Chen, and his reasons for passing her over for the promotion. Even Yang, Chen's partner, testified that he wanted to fire Chen at the

time the promotional decision was made, except that his "hands are tied."  The factual disputes and credibility issues should result in a denial of this motion for summary judgment.

    1.  <u>Plaintiff's Establishes a Prima Facie Case of Sex Discrimination</u>

The record evidence establishes a prima facie case of sex discrimination.

**Membership in a Protected Class**:  Plaintiff is a female, protected by Title VII's proscription on discrimination because of sex.

**Adverse Employment Action**:  Plaintiff was passed over for a promotion. There is no dispute that she suffered from an adverse employment action.

**Inference of Discrimination Because of Sex**:  Within ten months, from October 22, 2018 to August 12, 2019, Plaintiff went from being Chen's top choice for the position of General Manager, to rejecting her for the position right after returning from maternity leave.  There is no question that Plaintiff was qualified for the General Manager position, as she had served in that position as Acting General Manager on numerous occasions, and for extensive periods of time, including when Jill Mattiello was out on maternity leave, except for the rare occasion when Daston was assigned that role for 1 week in August 2018, because Mattiello, Dingman and Chen were not present.

The evidence demonstrates that when Jill Mattiello resigned, Heather Dingman was initially present with her and told Chen she was interested.  He claimed to be busy, then Chen took advantage of Dingman's momentary absence by contacting Daston and hurriedly offered her the position, pressing her to make a decision immediately, and then announced it immediately, while Dingman was still waiting to speak to him.

Immediately after the announcement, Mattiello asked Chen why he chose Daston over Dingman, and he told her that Dingman's brain was "scrambled by her baby." At some point he

also suggested to Mattiello that he was worried she did not work enough, although she had worked the same number of hours as Daston when she returned from maternity leave. Finally, when Chen texted Dingman to tell her that if she really thought about it, she would realize that her brain was scrambled by her baby, he admitted that his opinion about her as a new mother influenced his decision. This evidence creates an inference of discrimination.

2.   Defendants Fail to Offer a Legitimate Non-Discriminatory Justification that is not Contradicted by the Evidence.

Under *McDonnell Douglas*, once a plaintiff establishes the elements of a prima facie case of sex discrimination, the burden shifts to the defendant to produce legitimate, non-discriminatory reasons for its actions.  See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). In this case, Defendants' proffered justifications are contradicted by Mr. Chen's sworn statements and contemporaneous evidence, including text messages.

At his deposition, Chen stated that he did not promote plaintiff because her customer services skills are not "up to par," and is rude to customers, although the only example he could provide was the text message string from May 13, 2019 that did not include any customers, and in which Plaintiff was advocating in favor of a customer (Andre), so he could continue to frequent the restaurant. If anything, Chen was rude to a customer in that exchange, not Dingman.

On cross-examination during the deposition by his attorney, Chen's testimony changed, and he alleged that "she likes yelling" (although earlier he could not remember one instance when she yelled, other than after she was passed over for a promotion). (Chen 178:19-20).  He alleged "she will go around telling other customer how bad the customer is and all that," although he provided no specific incidents when this occurred, and no other witness corroborated this claim. (Chen 179:2-4).

He produced an Affidavit which contradicts his sworn testimony and should be

disregarded (see Section F below), alleging that Dingman was passed over due to her "management style."  However, Chen had repeatedly trusted her in a managerial role for years, before she gave birth, and offered her the job on October 22, 2018.  He has not identified any concrete way that her style was any different than his, nor has he ever mentioned this to her prior to the deposition.

  In June and July 2019, Chen contacted Plaintiff multiple times by text messages asking if she would return to work from maternity leave prior to July 15, 2019 so she could handle the payroll for the restaurant for him while he was out. (Dingman Aff. Exh. 2). This illustrates how much Chen trusted and relied upon her with sensitive managerial tasks.

  Chen testifies in his affidavit that Dingman was not working enough hours per week to be considered for General Manager position. (Chen Aff. ¶8). However, Ms. Dingman worked full time hours prior to her May 20, 2019 maternity leave and testified that she intended to return to full-time hours. (Dingman Aff. Exh. 2.) She and Daston worked the exact same number of hours for the two-week period after she returned from maternity leave, July 29, 2019 to August 12, 2019.  (Dingman Aff. Exh. 4). Therefore, that explanation suggests that Chen was relying on a sexual stereotype, by concluding that, as a new mother, she would be unable to attend to her professional duties and therefore was not an ideal employee.

  Defendants devote multiple pages of their Rule 56.1 statement and the Memorandum of Law painting Dingman as rude and discourteous to Andy Chen based only on private text messages between Dingman and Mattiello, that were disclosed during discovery, and which Mr. Chen had not been privy to.  Certainly, Mr. Chen could not have made a promotional decision on August 12, 2019 based on text messages that he could not have seen until they were disclosed in the course of this litigation.

Therefore, there are triable issues of fact as to whether Defendant has articulated a valid, nondiscriminatory justification for the failure to promote Ms. Dingman.

3.    The Record Demonstrates the Existence of a Factual Dispute Over Whether Employer's Justifications Are Pretexts for Discrimination.

Even assuming that some of Defendant's proffered justifications are legitimate, the record contains sufficient evidence from which a factfinder could conclude that these reasons are pretexts for discrimination against Plaintiff because of her sex.

As the Supreme Court has made clear, there is no one particular way in which a plaintiff can show pretext; rather, the evidence of pretext may take a variety of forms. See *Patterson v. McLean Credit Union,* 491 U.S. 164, 187 (1989). In determining whether a plaintiff's evidence of pretext is sufficient to permit an inference of discrimination and thereby overcome a defendant's motion for summary judgment, the Court has noted that the strength of the plaintiff's prima facie evidence and proof that the employer's explanation is false are two important factors to be considered. *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 148-49 (2000). The question is whether there is sufficient evidence to permit a juror to infer that the defendant's employment decision was "more likely than not" based on discrimination. See *Terry*, 336 F.3d at 138.

The strength of Plaintiff's direct evidence, as well as the contradictory explanations, Yang and Chen's evasiveness and vagueness at depositions about the reasons why Plaintiff was not promoted, and the lack of evidence in support of the defense, cast doubt on the justifications offered by Defendants for the promotional decision.

As set forth below, the evidence in the record suggests that each of Defendant's proffered justifications for its decision, taken on their own, are not credible.

 Purported Rudeness to Customers**:** Chen claimed that he did not promote Plaintiff due to rudeness to customers but could only vaguely point to a complaint of dry chicken, without any

19

details of who, when, where.  He now seems to have abandoned this claim, as it is not in his

affidavit. He also referred to the May 13, 2019 group text message as an example of rudeness.

However, in that text messages, Plaintiff advocated for customer Andre, who Chen wanted to

ban permanently from Fuji. Thus, any rudeness toward customers was on Chen's part.  Chen

claimed that customers complained about Plaintiff, but he was unable to provide any details

whosoever. Mattiello, Dingman and Sienkiewicz testified they had never heard of customer

complaints against Dingman.

Yang also could not describe any customer complaints about Dingman, referring vaguely

to Yelp or Facebook posts, but could not remember any details and did not produce any

documentation.  (Yang 84-86, 137). He testified that he is not aware of any other complaints

about Dingman, whether documented or undocumented. The fact that Chen offered Dingman the

General Manager position on October 22, 2018, contradicts the claim that she was unqualified.

Purported hot temper:  Chen claimed Plaintiff had a "hot temper" but the only incident he

could point to was her confrontation of Chen on August 12, 2019, after being passed over for a

promotion. (Chen 165:6-169:13). He testified that if "you insist [on] the question, I have to make

up something." (Chen 168:5-7).

C.  **Plaintiff has satisfied all preconditions to suit with respect to the retaliation cause of
action, and there are triable issues of fact**.

1.    Retaliation Claim is Reasonably Related to NYSDHR Complaint

In the Second Circuit, "claims that were not asserted before the EEOC may be pursued in a

subsequent federal court action if they are 'reasonably related' to those that were filed with

the agency." *Shah v. N.Y. State Dep't of Civil Servs*., 168 F.3d 610, 614 (2d Cir. 1999) (citations

omitted), cited by *Soules v. Connecticut*, 882 F.3d 52 (2nd Cir. 2018). "'A claim is reasonably

related to the filed claim if the conduct complained of would fall within the scope of the EEOC

investigation which can reasonably be expected to grow out of the charge that was made.' Id.

(internal quotation marks and citation omitted)." *Bundy v. Broome-Tioga Bd. of Coop. Educ.*

*Servs.*, 3:19-CV-1119 (GLS/ML)  (N.D.N.Y. June 19, 2020).

Dingman's retaliatory failure to promote claim is reasonably related to the original

administrative charge alleging a discriminatory failure to promote since the same set of facts are

material to the claim, including that a position was available, that plaintiff was qualified for the

position, and that she was not promoted by Defendant Chen for improper reasons, which

Defendants base in part on the May 13, 2019 text message string.  Plaintiff became aware of the

fact that she may have been retaliated against for opposing racial discrimination and/or

harassment in the workplace on about March 24, 2020, when Defendant submitted a statement to

NYSDHR alleging that Chen had chosen not to promote her based on that May 13. 2019 group

text conversation, in response to the discrimination claims. Based on this set of facts, the

retaliatory failure to promote claim was reasonably related to the original administrative charge.

Requiring the plaintiff to file a second lawsuit in state court regarding the employer's

retaliatory conduct, concerning the same promotional decision by the same Employer

representative on the same date, would be a waste of resources and impose additional costs on

the plaintiff. Plaintiff should not be barred from bringing the retaliation cause of action since it is

reasonably related to the original charge.

   2.   There are triable issues of fact with respect to the retaliation cause of action.

As shown on the May 13, 2019 text message string, Plaintiff complained of Mr. Chen's

lack of response to Donna's racist behavior in the workplace, and therefore engaged in protected

activity by opposing discrimination.  The main question is whether Chen retaliated against

Plaintiff for complaining about racism in the workplace.  There is more than sufficient evidence

for a factfinder to conclude that was the case, including:

(a)    Temporal Proximity: Retaliatory intent can be inferred from the timing of the

decision. See *Eckhart to Fox News*, 20-CV-5593 (RA), FN 13 (S.D.N.Y. Sep. 9,

2021)(reviewing temporal proximity cases). Dingman was passed over for a promotion only

three months after the May 13, 2019 text message string which was, moreover, only after 15

working days had elapsed, taking into consideration her maternity leave of May 20-July 29.

(b)    Chen's testimony that he did not promote Dingman for being rude to customers,

and referred to the May 13, 2019 text message string (Chen 103-105, 115-131);

(c)    Chen claimed that Dingman was rude in the May 13, 2019 text messages by

stating she refused to serve Donna, when that does not appear anywhere in the texts (Chen 131);

(d)    Chen was hostile toward Plaintiff for reporting racism, as evident by his

testimony that Dingman was lying, and denying any knowledge of Donna's racist statements

(Chen 125-126).  Several witnesses (Sienkiewicz, Dingman and Mattiello) all testified that

Donna used the "n" word toward at least one customer (Jamal) and at least one employee

(Cheyenne), and made other racist statements toward non-white employees, and that Chen knew

about this behavior.

There is, in short, sufficient evidence for a factfinder to conclude that Chen retaliated

against Plaintiff for opposing discrimination in the workplace.

**D.  Defendants have not established an entitlement to summary judgment with respect
to the NYSHRL claims**

For all the reasons set forth above, there is no basis to dismiss the state law

discrimination and retaliation claim.  Plaintiff maintains that she was unlawfully discriminated

against on the basis of her gender, including her childbirth and status as a mother with a newborn

child, and retaliated against by being passed over for a promotion.   Evidence described above

makes it indisputable that plaintiff has established a claim of discrimination based on gender and familial status and retaliation.

**E.  There is no basis to dismiss the claims against Chen under Sections 296(1) and (6).**

NYSHRL allows for individual liability under two theories. The first theory permits individual liability "if the defendant 'has an ownership interest' in the employer or has 'the authority to hire and fire employees[.]'" N.Y. Exec. Law § 296(1); *Gorman v. Covidien, LLC,* 146 F. Supp. 3d 509, 521-22 (S.D.N.Y. 2015) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)). The second theory permits such liability "if the defendant aided and abetted the unlawful discriminatory acts of others." N.Y. Exec. Law § 296(6); *Gorman*, 146 F. Supp. 3d at 522 (citing E.E.*O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 407, 523 (E.D.N.Y. 2014)).

Here, Defendant Chen had the authority to hire and fire employees. Therefore, he may be held individually liable under Section 296(1) of the NYSHRL, even though Plaintiff's actual employer was Fuji Steakhouse Japanese Sushi Inc.

Chen is also subject to aider and abettor liability under Section 296(6), which can be imposed upon one who played a principal role in the alleged conduct. *See Parra v. White Plains,* 48 F.Supp.3d 542, 555 (S.D.N.Y. 2014) ("in this regard, the individual defendant, who may have personally committed the discrimination, is not held liable for aiding and abetting his own actions, but, instead, is deemed liable for aiding and abetting the primary violation by the employer."") (citation omitted).   Chen's participation, even to the extent that he is viewed as the principal actor, readily falls within the scope of liability under Section 296(6).

**F.  Chen's Affidavit Contradicts his Deposition Testimony and should be Disregarded.**

"It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United*

*States,* 814 F.2d 120, 124 (2d Cir. 1987). See also *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 7619 (2d Cir. 1996) (rejecting affidavit contradicting affiant's previous deposition testimony).

Chen's Affidavit contradicts his deposition testimony and, moreover, his statements are disproven by admissible evidence.  For example.

1.    Affidavit Par. 3: "I wanted a fresh start with a management style that would follow my style of management."  At his deposition he testified that he did not promote Dingman because "I don't know if she's interested in the position.  But all along we all know that she is not qualified" and "she just doesn't have the capability to handle it" because "customer service is not up to par" and "she not good to customer. She just not managerial quality" and "everybody knows her customer service is no good." (Chen 163:10-165:8, 167:8-11).

2.    Affidavit Par. 8 states plaintiff was not working enough hours to qualify as General Manager, but this is contradicted by the payroll records. Both Daston and Dingman worked the same number of hours for the period following Dingman's maternity leave. Also, Dingman regularly worked 55-70 hours.  (Dingman Aff. Exh. 2).

3.    Affidavit Par. 10 states Chen was owner/manager in 2013, but he testified that Mattiello was General Manager when he joined Fuji, which was 2015 or 2016.  (Chen 31:7-10; Mattiello 7-8).

4.    Affidavit Par. 12 states Chen promoted Mattiello to Floor Manager, but he testified that Mattiello was General Manager when he arrived. (Chen 31:7-10).

5.    Affidavit Par. 13 states Plaintiff was passed up for a promotion in 2015, which contradicts Yang's testimony that Dingman was offered the position before Mattiello was promoted. (Yang 102:4-16).

6.      Affidavit Par. 19 states that he has not mastered the English language, but he testified he acquired a Master's degree in 1990 in Brooklyn, in English (Chen 14:2-11, 16:2-4), that he communicated with Jill and Heather in English (69:21), and he repeatedly responded to deposition questions in English (Chen 8, 14, 71, 80 144, et al.)

7.      Affidavit Par. 31-33: Chen distances himself from the May 13, 2019 text messages, now claiming they are "not the reason that I did not promote Plaintiff." Chen had testified at his deposition that Dingman was not promoted because of rudeness to customers, and the only specific example he could provide are the May 13, 2019 text messages (Chen 104:4-105:10, 115:15-134:23). He had argued that Dingman's text message complaining that Chen did not address Donna's racist behavior at Fuji, was actually a refusal to be Donna's server at the restaurant. The Affidavit now effectively rejects the deposition testimony, replacing his statements with a new, refined explanation that is at odds with his prior explanations.

Chen's statements in the Affidavit and at his deposition create genuine disputes of material fact as to the actual factors that Chen relied upon when he passed Heather Dingman over for a promotion on August 12, 2019.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment must be denied.

Dated: Poughkeepsie, New York
            September 13, 2021

                                LAW OFFICE OF LAURA WONG-PAN PLLC
                                /s/ Laura Wong-Pan

                                _____
                                Laura Wong-Pan
                                319 Mill Street
                                Poughkeepsie, New York 12601
                                (845) 218-1288